UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

TOP SHELF MARKETING CORP., a New Jersey
corporation,

RELIABLE BUSINESS CONSULTANTS, LLC,
also doing business as ONLINE COMMERCE
PROS, a New York limited liability company,

CREATIVE BUSINESS SETUP, LLC, a Utah
limited liability company,

LEGAL ENTITY PROVIDERS, LLC, a Utah
limited liability company,

POWER HOUSE DATA INC., a New Jersey
corporation,

UNITED BUSINESS 101, LLC, a New York
limited liability company,

VIXOUS MERCHANT SERVICES, LLC, also
doing business as VIXOUS PAYMENTS, a Utah
limited liability company, and KEYBANCARD,
LLC, as a successor limited liability company,

ANTHONY FIORE, individually and as an officer
and owner of RELIABLE BUSINESS
CONSULTANTS, LLC and POWER HOUSE
DATA, INC. and as an officer of TOP SHELF
MARKETING CORP.,

JOSEPH GOVERNARA, also known as JOE
MORRIS, individually and as owner of UNITED
BUSINESS 101 and an officer and owner of

Case No. 16-cv-206

**COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER
EQUITABLE RELIEF**

RELIABLE BUSINESS CONSULTANTS, LLC,

RYAN HULT, individually and as an officer and
owner of TOP SHELF MARKETING CORP. and a
principal of RELIABLE BUISNESS
CONSULTANTS, LLC,

DAVID MERHI, individually and as an officer and
owner of CREATIVE BUSINESS SETUP LLC,
owner of LEGAL ENTITY PROVIDERS, LLC,
officer of TOP SHELF MARKETING CORP., and
principal of RELIABLE BUSINESS
CONSULTANTS, LLC, and

DAVID VANKOMEN, individually and as a
principal of VIXOUS MERCHANT SERVICES,
LLC,

     Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer

Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain

temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts,

restitution, the refund of monies paid, disgorgement of ill-gotten monies, appointment of a

receiver, and other equitable relief for Defendants' acts or practices in violation of Sections 5(a) of

the FTC Act, 15 U.S.C. § 45(a), and the FTC's trade regulation rule entitled Telemarketing Sales

Rule ("TSR" or "Rule"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c) and 6105(b).

3. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C.
§ 53(b).

## SUMMARY OF THE CASE

4. The FTC brings this enforcement action against a deceptive telemarketing enterprise
and its credit card processing partners. The telemarketing enterprise is comprised of several
interrelated entities controlled by a few individuals (referred to herein as the "RBC Defendants")
and offers various purported business development products and services to consumers trying to
start a home-based Internet business. The RBC Defendants induce consumers to pay thousands of
dollars – most of it charged on their credit cards – by falsely promising, among other things, that
their services will enable consumers' home-based businesses to succeed and be profitable. Most
consumers who purchase the RBC Defendants' products and services, however, do not end up with
a functional online business, earn little or no money, and end up heavily in debt.

5. To further this scheme, the RBC Defendants use straw men and dummy companies
to obtain merchant accounts needed to accept consumers' credit card payments. The RBC
Defendants have engaged in this unlawful practice known as credit card laundering with other
defendants (referred to herein as the "Vixous Payments Defendants") who helped secure and
maintain these merchant accounts for this telemarketing scheme.

6. The FTC seeks permanent injunctive and monetary relief to put an immediate stop
to this enterprise and hold Defendants liable for millions of dollars of consumer harm.

## PLAINTIFF

7. The FTC is an independent agency of the United States Government created by

3

statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

8.     The FTC is authorized to initiate federal district court proceedings, in its own name and by its designated attorneys, to enjoin violations of the FTC Act and the Telemarketing Act, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, refund of monies paid, and disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), and 57b.

## DEFENDANTS

### The RBC Corporate Defendants

9.     Defendant Top Shelf Marketing Corp. ("TSM") is a New Jersey corporation with its principal place of business at 291 River Road, Suite 2R, Clifton, New Jersey 07014. TSM also has done business as Creative Business Set Up. TSM transacts or has transacted business in this district and throughout the United States.

10.    Defendant Reliable Business Consultants, LLC ("RBC") is a New York limited liability company with its principal place of business at 14 Wall Street, Suite 3C, New York, New York 10005 and formerly located at 80 Broad Street, Suite 631, New York, New York 10004. RBC also does business as Online Commerce Pros. RBC transacts or has transacted business in this district and throughout the United States.

11.    Defendant Creative Business Setup, LLC ("Creative Business") is a Utah limited

4

liability company with its principal place of business at 2997 East Dimple Dell Lane, Sandy, Utah 84092. Creative Business transacts or has transacted business in this district and throughout the United States.

12.    Defendant Legal Entity Providers, LLC ("LEP") is a Utah limited liability company with its principal place of business at 10808 South Riverfront Parkway, Suite 311, South Jordan, Utah 84095. LEP transacts or has transacted business in this district and throughout the United States.

13.    Defendant Power House Data, Inc. ("PHD") is a New Jersey corporation with its principal place of business at 291 River Road, Suite 2R, Clifton, New Jersey 07014 and a secondary address at 214 State Street, Hackensack, New Jersey 07601. PHD transacts or has transacted business in this district and throughout the United States.

14.    Defendant United Business 101, LLC ("United Business," and, together with TSM, RBC, Creative Business, LEP, and PHD, the "RBC Entities") is a New York limited liability company with its principal place of business at 80 Broad Street, Suite 631, New York, New York 10004. United Business transacts or has transacted business in this district and throughout the United States.

## The RBC Individual Defendants

15.    Defendant Anthony Fiore ("Fiore") is a resident of Hillsdale, New Jersey. He has been the designated owner and President of RBC since March 2014, and he is the sole owner and President of PHD. He has also been a signatory on several financial accounts for TSM. At all times material to this Complaint, acting alone or in concert with others, Fiore has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth

5

in this Complaint. Fiore, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

16.     Defendant Joseph Governara, also known as Joe Morris ("Governara"), is a resident of West New York, New Jersey. He is the sole owner of United Business. He is a consultant to and, in actuality, a principal of RBC, and he was the sole owner and President of RBC through March 2014. At all times material to this Complaint, acting alone or in concert with others, Governara has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Governara, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

17.     Defendant Ryan Hult ("Hult") is a resident of River Vale, New Jersey. He was the CEO and sole owner of TSM and was a consultant to and a principal of RBC through at least September 2014. Through in or around September 2014, acting alone or in concert with others, Hult has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Hult, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

18.     Defendant David Merhi ("Merhi" and, together with Fiore, Governara, and Hult, the "RBC Individual Defendants," and, together with the RBC Entities, the "RBC Defendants") is a resident of Sandy, Utah. He is a managing member and an owner of Creative Business and the sole owner of LEP. He is also a consultant to and a principal of RBC. He was also a consultant to and a principal of TSM. At all times material to this Complaint, acting alone or in concert with others, Merhi has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Merhi, in connection with the matters alleged

6

herein, transacts or has transacted business in this district and throughout the United States.

## The Vixous Payments Defendants

19.     Defendant Vixous Merchant Services, LLC, also doing business as Vixous Payments, is a Utah limited liability company with its principal place of business at a residential address in Salt Lake City, Utah. In March 2014, the Vixous Merchant Services, LLC's company registration with the Utah Secretary of State expired and has not been renewed. In June 2014, the principals of Vixous Merchant Services, LLC – defendant David VanKomen and his brother, Paul VanKomen – formed KeyBancard, LLC, a Utah limited liability company with its principal place of business at the same residential address in Salt Lake City, Utah (Vixous Merchant Services, LLC and KeyBancard, LLC are collectively referred to herein as "Vixous Payments"). Vixous Payments transacts or has transacted business in this district and throughout the United States.

20.     Defendant David VanKomen, is a resident of Salt Lake City, Utah. He is an officer and principal of KeyBancard LLC and was an officer and principal of Vixous Merchant Services, LLC. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Vixous Payments set forth in this Complaint. David VanKomen, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

21.     TSM, RBC, Creative Business, LEP, PHD, and United Business have operated and functioned as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged in this Complaint. They operated as a web of interrelated companies in

7

furtherance of their shared deceptive scheme. TSM and, subsequently, RBC were at the center of this arrangement, employing the telemarketing staff that generated sales. Creative Business supplied a telemarketing license, and the remaining RBC Entities were shell companies used to improperly acquire credit card processing accounts on behalf of the RBC Defendants. The RBC Entities also co-mingled funds and have common office locations. Because these RBC Entities have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices described in this Complaint. Furthermore, Fiore, Governara, Hult, and Merhi have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the RBC Entities that constitute the common enterprise.

## COMMERCE

22.     At all times material to this Complaint, the Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act and 15 U.S.C. § 44.

## OVERVIEW OF THE RBC DEFENDANTS' BUSINESS ACTIVITY

23.     Since approximately January 2013, and continuing thereafter, the RBC Defendants have engaged in telemarketing through a plan, program, or campaign involving one or more telephones and more than one interstate call. They have used a variety of deceptive tactics described herein to induce consumers to purchase products and services purportedly designed to help them build a home-based or other startup business.

24.     The RBC Defendants have maintained their telemarketing operation in part by utilizing sham arrangements with shell companies to gain unauthorized access to credit card

8

processing services that otherwise would not have been available directly. These services are essential to the RBC Defendants' business operations because the RBC Defendants transact sales by telephone and receive payments from consumers by credit or debit card.

25.     Through their deceptive sales practices and their sham credit card processing arrangements (also referred to herein as "merchanting" arrangements), the RBC Defendants have taken in over $16 million from thousands of consumers across the country.

26.     The RBC Defendants' telemarketing enterprise began in January 2013. On January 9, 2013, the FTC commenced an enforcement action (captioned *FTC, et al. v. The Tax Club, Inc., et al.*, No. 13-cv-210-JMF (S.D.N.Y. filed Jan. 9, 2013)) against a group of entities and their principals doing business as, among other entities, The Tax Club, for engaging in deceptive telemarketing practices in connection with the sale of purported small business development products and services. That same month, Hult formed TSM. Hult is a former Tax Club employee, as were several of the telemarketers who worked for the RBC Entities.

27.     TSM began its telemarketing operations under its own name in or around March or April of 2013 when it received its telemarketing license. Before then, TSM operated under a telemarketing license obtained by Creative Business and did business as Creative Business Set Up.

28.     Hult was the sole owner of TSM and helped formulate policies governing its sales practices. For example, he hired TSM's staff, created sales scripts, and acquired "leads" (contact information for potential customers) for TSM.

29.     Hult recruited Merhi to supply leads and provide merchanting for TSM. Merhi was a signatory on TSM bank accounts at Chase Bank.

30.     Hult also recruited Fiore to assist with accounting and provide merchanting for

9

TSM. Fiore was a signatory on TSM bank accounts at Bank of America.

31.    During the second half of 2013, TSM began winding down its business after experiencing unsustainable financial liabilities, including customer refund expenses, and after payment processors terminated several of TSM's credit card processing accounts. TSM ceased operations in approximately December 2013.

32.    As TSM's business wound down, TSM's business operations and relationships shifted to RBC, a company formed by Governara in September 2013 that sold the same kinds of purported business development products and services. For example:

    a.    TSM transferred its leads to RBC;

    b.    Members of TSM's sales staff transferred to RBC;

    c.    TSM's customers were transferred to RBC;

    d.    Merhi began providing leads and merchanting to RBC;

    e.    Fiore began providing accounting services and merchanting to RBC;

    f.    Hult began providing leads to RBC and did so until September 2014; and

    g.    RBC used a legacy TSM credit card processing account to process sales made by RBC.

33.    At RBC, Governara managed the sales staff, created sales scripts, and formulated sales practices. He also provided merchanting to the RBC Defendants. He was the sole owner of RBC until approximately March 2014, when Fiore became sole owner and managing member. Both were signatories on RBC bank accounts at TD Bank and Bank of America.

34.    The RBC Defendants structured their relationships with one another nominally as consultants. When Hult owned TSM, Merhi and Fiore were each consultants for TSM. When

10

Governara owned RBC, Fiore, Hult, and Merhi were each consultants for RBC. When Fiore became the designated owner of RBC, Governara, Hult, and Merhi were each consultants for RBC. In substance, however, the RBC Entities operated as a common endeavor between and among each of the RBC Individual Defendants.

35.     Generally, Fiore, Hult, Governara, and Merhi shared the profits generated by the RBC Entities on a weekly basis. Each individual's share was loosely based on that person's contributions to the business during that week, including lead acquisitions and merchanting. Hult determined the profit split from week to week when TSM was the operating entity, and Hult, Governara, and Merhi jointly determined the profit split from week to week after RBC became the operating entity.

36.     Hult received payments from the RBC Entities directly and indirectly through an entity he controlled called Don's Customs, Inc.

37.     Merhi received payments from the RBC Entities directly and indirectly through an entity he controlled called Maximillian Consulting Group, Inc. and through a trust called the Michelle J. Merhi Family Trust.

38.     Fiore received payments from the RBC Entities directly and indirectly through an entity he controlled called Turner Busch, Inc.

39.     Governara received payments from the RBC Entities directly and indirectly through an entity he controlled called JMVG Consulting Group, Inc.

## THE RBC DEFENDANTS' DECEPTIVE TELEMARKETING PRACTICES

40.     The RBC Defendants sell products and services purportedly designed to help consumers build a home-based or other small business. These products and services include,

11

among other things, business entity formation, corporate document filing, bookkeeping services, business plans, market research, business credit development, marketing strategies, and website building.

41.     The RBC Defendants typically charge consumers an up-front fee of several thousand dollars for each of their various products and services followed by smaller monthly payments.

42.     The RBC Defendants rely on leads to market their products and services. Those potential customers typically have already purchased a purported business opportunity, or a related product or service, from another telemarketing operation that, in turn, sold its customers' information as leads to the RBC Defendants. Entities that sell customer information as leads are known as "lead sources."

43.     The RBC Defendants' telemarketing staff contact the consumers identified as leads by telephone to sell the RBC Defendants' products and services. Even after completing an initial sale, the RBC Defendants' telemarketing staff contact the same consumers again to "upsell" additional products and services.

44.     The RBC Defendants remit a portion of the revenue generated from each lead, typically 25-40%, back to the lead source as payment for the lead.

45.     The RBC Defendants' telemarketing staff are paid solely on a commission basis. They generally receive 10-15% of the revenue they generate from each lead.

### Misrepresentations About Affiliation

46.     The RBC Defendants' telemarketing staff typically begin their sales calls by claiming that they are calling as part of the product or service consumers previously purchased

12

from the lead source. They often identify themselves as a "business advisor."

47.     Consumers therefore are misled to believe that the RBC Defendants are connected to the product or service that the consumers already purchased.

48.     The RBC Defendants' telemarketers further compound consumers' confusion by failing to promptly disclose that the purpose of the call is to sell a product or service.

49.     Consumers therefore are misled to believe that the RBC Defendants are calling to fulfill or otherwise provide a service.

#### Misrepresentations to Obtain Consumer's Personal Financial Information

50.     The RBC Defendants typically charge consumers several thousand dollars for each of their various products and services. The exact price typically depends on the amount of savings and credit consumers have available.

51.     In numerous instances, the RBC Defendants' telemarketers probe consumers' financial circumstances and financial account information during sales calls in order to maximize sales and increase the prices they charge. They ask consumers for their credit card numbers, issuing bank names, credit limits, and current balances, claiming that they will use this information to provide financial advice to consumers and/or to provide this information to other service providers, such as lenders or drop shippers, for the consumers' benefit. The RBC Defendants then call the issuing bank for consumers' credit cards to verify consumers' available credit and, at times, they ask, or direct the consumer to ask, for credit limit increases.

52.     The telemarketers' representations about using consumers' financial information to provide financial advice and/or to provide this information to other service providers for the consumers' benefit are false because the telemarketers do not use the information for these

13

purposes. Instead, in numerous instances, the RBC Defendants use this information to decide how much to charge consumers for products and services, and how many products and services to sell them. The more credit consumers have on hand, the more they are asked to pay.

## Misrepresentations About Costs and Earnings

53. In numerous instances, the RBC Defendants' telemarketers encourage consumers to purchase the RBC Defendants' programs by claiming that consumers ultimately will not have to pay the charges out of their own pocket.

54. In numerous instances, the RBC Defendants' telemarketers claim that consumers who purchase the RBC Defendants' products and services: (a) will earn enough money from their future businesses to recoup the purchase price; or (b) will be able to transfer those costs to their future businesses.

55. The RBC Defendants' claims about transferring and recouping the purchase price are false because, in numerous instances, consumers who purchase the RBC Defendants' products and services are not able to recoup the purchase cost from future business income and are not able to transfer the purchase price to future businesses. In fact, in numerous instances, consumers who purchase the RBC Defendants' products and services are never able to establish an operating business.

56. In numerous instances, the RBC Defendants' telemarketers also claim that consumers who purchase the RBC Defendants' products and services will earn thousands of dollars per month from their future businesses.

57. These earnings claims are false because, in numerous instances, consumers who purchase the RBC Defendants' products and services do not make thousands of dollars per month

14

from future businesses.

## Misrepresentations About the Scope and Nature of Products and Services Provided

58.    The RBC Defendants do not fulfill the products and services they sell as promised.

59.    For example, in numerous instances, the RBC Defendants' telemarketers falsely claim that: (a) consumers will have unlimited access to business advisors who will provide specialized expert advice tailored to the consumers' specific needs; (b) consumers will receive individualized business plans tailored to their particular business; or (c) consumers will receive specialized assistance necessary to develop and obtain business credit.

60.    In numerous instances, purchasers are unable to access a live business advisor or even reach a single, consistent point of contact.

61.    In numerous instances, purchasers do not receive individualized business plans tailored to their particular businesses but, rather, only boilerplate, prefabricated plans.

62.    In numerous instances, purchasers receive only generic business credit information and are unable to obtain business credit.

## Returns and Chargebacks

63.    Consumers open and maintain credit card accounts through institutions known as "issuing banks."

64.    Consumers have the ability to dispute charges that appear on their credit card bills by initiating what is known as a "chargeback" with their issuing bank. The chargeback process is intended to protect consumers from fraud and unauthorized charges on their credit card bills.

65.    Credit card associations – such as Visa and MasterCard – have rules regarding the chargeback process. Those rules provide that when a consumer disputes a charge through the

15

chargeback process, the consumer's issuing bank provisionally credits the consumer's credit card

for the amount of the disputed charge. The customer's dispute is then relayed to the merchant,

which, in turn, may challenge the attempted chargeback by arguing that the charge was, in fact,

valid. If the merchant challenges the attempted chargeback, the credit card association rules

govern the manner in which the dispute is resolved. If the merchant is successful in disputing the

chargeback, then the issuing bank reverses any provisional credit issued to the consumer, and the

consumer becomes financially responsible for the disputed charge. If the consumer prevails and

the chargeback is sustained, then the disputed charge is removed from the consumer's account

permanently or an offsetting credit is issued, and the charge amount is recouped from the merchant.

66.    In contrast to a chargeback, a refund (or "return") occurs when a consumer contacts

the merchant directly to obtain a reversal of charges to his or her credit card account. Refunds

issued by merchants directly to consumers do not result in chargebacks. In some instances, a

merchant may refund money to consumers while a chargeback is pending, which may help the

merchant avoid the fees and scrutiny associated with the chargeback process.

67.    The RBC Defendants' chargeback rates are excessive. For example, in 2014, the

RBC Defendants' internal records reported an overall chargeback rate of 3.8%.

68.    The credit card associations consider chargeback rates in excess of 1% to be

excessive.

69.    Moreover, the RBC Defendants condition refunds (including partial refunds) on

consumers agreeing not to complain or report their experiences with the RBC Defendants to

government entities or non-profit entities like the Better Business Bureau.

70.    The RBC Individual Defendants were each aware of the RBC Entities' chargeback

16

and return rates.

71.     For example, the RBC Defendants maintain a Master Sales Sheet, which is a spreadsheet that tracks and itemizes sales data, including each individual chargeback and refund.

72.     Additionally, Fiore circulates a weekly profit and loss report among the RBC Individual Defendants that includes excerpts from the Master Sales Sheet showing sales data, including chargebacks and refunds, for that particular week.

## OVERVIEW OF MERCHANT ACCOUNTS AND CREDIT CARD LAUNDERING

73.     A "merchant account" is a type of account that allows businesses to process consumer purchases by credit or debit card.  Merchant accounts are available through financial institutions called "merchant acquiring banks" or "acquirers."  Without access to a merchant acquiring bank, which is a member of one or more of the credit card associations like MasterCard and Visa, merchants are not able to accept consumer credit or debit card payments.

74.     Merchant acquiring banks frequently enter into contracts with entities known as "payment processors" that manage the bank's merchant processing program.  Payment processors in turn frequently enter into contracts with multiple "independent sales organizations" ("ISOs") to sign up merchants for merchant accounts.  ISOs may, in turn, enter into contracts with sub-ISOs or sales agents to assist them in selling their services.

75.     Before a payment processor will establish a merchant account, the merchant has to meet the bank and processor's underwriting criteria.  Some companies are denied merchant accounts because the payment processor concludes that the company applying for the merchant account is too much of a risk.  For example, the payment processor may conclude that the merchant

might be at risk of operating in an illegal way or might be concerned that the merchant will generate excessive consumer chargebacks.

76.     To assist in the process of underwriting merchant accounts, the credit card associations have created programs to track merchants and individuals that previously have had merchant accounts terminated by merchant acquiring banks for, among other things, excessive chargebacks.  MasterCard, for example, maintains the Member Alert to Control High-Risk Merchants ("MATCH") list.  This list includes merchants (and principals) whose accounts were terminated by merchant acquiring banks for certain reasons.  For example, a merchant acquiring bank must place a merchant on the MATCH list when the bank terminates the merchant's processing account for fraud, excessive chargebacks, or other violations of the credit card association's operating rules.

77.     If a merchant is not able to obtain a credit card merchant account or does not wish to use its own name to establish a merchant account, it may recruit another company (that does have a merchant account or that can readily open a merchant account) to process credit card transactions through the recruited company's merchant account.  This is known as credit card laundering and is an unlawful business practice.

78.     Credit card laundering negatively affects commerce in the marketplace.  In the event of fraud, consumers who have suffered a financial loss will file complaints against the (recruited) company that charged their accounts, rather than the merchant that initiated the charges.  The confusion about what company caused consumer injury can make it easy for unscrupulous merchants to avoid detection by consumers and by law enforcement.  Furthermore, even if the bank and processors terminate the account that was used to launder credit card payments, the bank and

18

processor may not learn the identity of the true culprit that caused excessive chargebacks. The true culprit is then able to perpetuate the scheme as long as it can recruit other companies to provide access to their merchant accounts.

## DEFENDANTS' CREDIT CARD LAUNDERING SCHEME

79.     The RBC Defendants engaged in a credit card laundering scheme in which they processed payments for sales generated by TSM, and later RBC, through merchant accounts opened and maintained by other entities. These other entities included: (a) shell companies; and (b) other telemarketing operations that made their own merchant accounts available to the RBC Defendants in exchange for a fee.

80.     The RBC Defendants' use of merchant accounts established in the name of one entity to process sales transactions by another entity not disclosed on the merchant applications is not authorized by the merchant agreements and is prohibited by the credit card associations, Visa and MasterCard.

### The RBC Defendants Used Shell Companies to Launder Sales

81.     Among the RBC Entities, only TSM and, subsequently, RBC employed the telemarking staff that generated sales. Creative Business supplied the RBC Defendants with a telemarketing license. The remaining entities within the RBC Defendants – LEP, PHD, and United Business – were created and utilized only for opening and maintaining merchant accounts through which the RBC Defendants processed sales generated by TSM and RBC.

82.     For example, Merhi incorporated LEP in his wife's name and opened merchant accounts in the name of LEP. LEP had no employees and did not conduct any business. Merhi supplied the LEP merchant accounts to the RBC Defendants to submit for payment credit and debit

19

card sales drafts resulting from telemarketing transactions between cardholders and TSM and RBC.

83.     Merhi listed his wife rather than himself on the incorporation documents for LEP and on LEP's merchant account application because Merhi previously had been placed on the MATCH list. In actuality, Merhi had control over LEP all along. For example, Merhi was a signatory on LEP's bank accounts at America First Credit Union and Chase Bank. Merhi amended LEP's corporate filings in June 2013 to formally list himself as sole owner.

84.     Fiore formed PHD and opened a merchant account in the name of PHD. PHD had no employees and did not conduct any business. Fiore supplied the PHD merchant account to the RBC Defendants to submit for payment credit and debit card sales drafts resulting from telemarketing transactions between cardholders and TSM and RBC.

85.     Governara formed United Business and opened a merchant account in the name of United Business. United Business had no employees and did not conduct any business. Governara supplied the United Business merchant account to the RBC Defendants to submit for payment credit and debit card sales drafts resulting from telemarketing transactions between cardholders and RBC.

86.     Hult opened a merchant account in the name of TSM and supplied this merchant account to the RBC Defendants to process credit card sales by TSM and also by RBC after TSM's business operations wound down.

87.     By having access to so many merchant accounts in different entity names, the RBC Defendants were able to circumvent monthly sales volume limits imposed by payment processors on new merchants like TSM and RBC. Using so many merchant accounts in different entity names

20

also has allowed the RBC Defendants to maintain uninterrupted merchant processing capability even after certain merchant accounts were closed or suspended by an acquirer.

88.     At the end of 2013, the RBC Defendants looked for additional merchant accounts to process more telemarketing sales generated by RBC. For example, in December 2013, Merhi emailed Hult and Governara about finding "nominees" (straw men) to provide new merchant accounts: "We desperately need nominees for merchanting. We will pay up to 3 points on everything we charge . . . so it can be 3-4K a month for friends/family as an enticement if need be. . ."

89.     In 2014, the RBC Defendants used third-party nominees, usually family members or friends, to establish merchant accounts through which RBC Defendants could launder the credit card sales generated by RBC. In exchange for the use of these merchant accounts, RBC Defendants paid the third parties fees based on the sales volume processed

90.     For example, Governara's father, nominee Louis C. Governara, formed Online Corporate Services, LLC ("OCS") and opened merchant accounts in the name of OCS. Louis C. Governara and OCS supplied these merchant accounts to the RBC Defendants to submit for payment credit and debit card sales drafts resulting from telemarketing transactions between cardholders and RBC.

91.     The other entities set up by nominees to open merchant accounts through which the RBC Defendants processed sales generated by TSM and RBC included: Business Entity Solutions, LLC ("BES"); United Entity Solutions, LLC ("UES"); Business314 LLC ("B314"); Creative Entity Setup LLC ("CES"); and Distributions Logistics, LLC ("DL").

92.     Whenever an RBC (and, previously, a TSM) telemarketer completes a sale, the

21

associated payment transaction is processed through one of these various merchant accounts in the name of a shell entity. The payment from the consumer is deposited into a bank account belonging to the shell entity whose merchant account is used to process that transaction. Typically, those deposited funds are then periodically swept into a bank account belonging to either PHD or RBC (and, formerly, TSM), and, from there, they are used to cover the expenses of the RBC Entities or are distributed to the RBC Individual Defendants as profits.

93.     Neither the applications nor the merchant agreements for these various merchant accounts disclosed that the sales processed through those accounts would be generated by TSM or RBC. Instead, these merchant account applications and agreements authorized only the various shell entities to submit credit and debit card sales drafts as the merchants of record.

94.     Most of the RBC Defendants's laundered sales were processed through merchant accounts opened with Secure Bancard, LLC ("Secure Bancard"), a registered ISO of the merchant acquiring bank, Synovus Bank.

### The RBC Defendants Also Arranged for other Telemarketers to Launder Its Sales

95.     The RBC Defendants also arranged for other telemarketing entities to process credit card payments for sales by TSM and RBC through those entities' merchant accounts.

96.     For example, Hult and Merhi arranged for a telemarketing entity called E-commerce Consulting, LLC located in Utah to process credit card payments for TSM through E-commerce Consulting LLC's existing merchant account in exchange for a fee.

97.     Merhi and Governara arranged for at least two other telemarketing entities in Utah, Business Development Systems, LLC and Elite Consulting Group, Inc. to process credit card payments for RBC through those merchants' existing merchant accounts in exchange for a fee.

22

## VIXOUS PAYMENTS' ROLE IN THE SCHEME

98.     Since at least November 2013, Vixous Payments has operated as a sales agent for Secure Bancard. Pursuant to its agent agreement, Vixous Payments would solicit qualifying merchants to apply for merchant accounts through Secure Bancard. In return, Vixous Payments received a percentage of the merchant account servicing fees earned by Secure Bancard from merchants recruited by Vixous Payments.

99.     Since at least January 2014, Vixous Payments assisted and facilitated the RBC Defendants' credit card laundering scheme by helping set up merchant accounts in the name of shell entities for the RBC Defendants.

100.    David Van Komen led and operated Vixous Payments, and advised the RBC Defendants to open multiple merchant accounts using nominees and shell entities in order to circumvent volume limits imposed by payment processors on new merchants like TSM and RBC.

101.    Vixous Payments then submitted merchant account applications and signed merchant agreements to Secure Bancard for shell entities and nominees, through which the RBC Defendants submitted for payment credit and debit card sales drafts resulting from telemarketing transactions between cardholders and RBC.

102.    As the sales agent for merchant accounts used by the RBC Defendants, Vixous Payments had access to the transaction details for those accounts, including sales volume levels and return and chargeback statistics.

103.    To help implement the laundering scheme, David Van Komen regularly updated the RBC Defendants about month-to-date processing volume for the laundered accounts, and he encouraged the RBC Defendants to process more sales in the accounts that had volume available.

23

104.     David Van Komen advised the RBC Defendants to avoid processing sales with

laundered accounts through the Discover network because he believed Discover scrutinized

transactions more closely than Visa or MasterCard.

## VIOLATIONS OF THE FTC ACT

105.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

or practices in or affecting commerce."

106.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts

or practices prohibited by Section 5(a) of the FTC Act.

107.     As set forth below, RBC Defendants have engaged in violations of Section 5(a) of

the FTC Act in connection with the telemarketing and sale of their purported business development

products and services.

### Count One
### Misrepresentation – Costs and Earnings
### (Against the RBC Defendants)

108.     In numerous instances in connection with the telemarketing and sale of their

products and services, the RBC Defendants have represented, directly or indirectly, expressly or by

implication, that consumers who purchase the RBC Defendants' products and services:

        a.     will recoup the cost of the RBC Defendants' products and services through

        business earnings;

        b.     will be able to transfer the cost of the RBC Defendants' products and

        services to their future businesses; or

        c.     are likely to earn substantial income.

109.     In truth and in fact, in numerous instances in which the RBC Defendants have made

24

the representations set forth in Paragraph 108 above, consumers who purchased the RBC

Defendants' products and services:

> a.      did not recoup the cost of the RBC Defendants' products and services
>
> through business earnings;
>
> b.      could not transfer the cost of the RBC Defendants' products and services to
>
> their future businesses; or
>
> c.      did not earn substantial income.

110.    The RBC Defendants' representations as set forth in Paragraph 108 of this

Complaint are false or misleading or were not substantiated at the time the representations were

made.

111.    Therefore, the RBC Defendants' representations, as set forth in Paragraph 108 of

this Complaint, are false and misleading, and constitute a deceptive act or practice in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count Two**
**Misrepresentation – Products and Services Provided**
**(Against the RBC Defendants)**

112.    In numerous instances in connection with the telemarketing and sale of their

products and services, the RBC Defendants have represented, directly or indirectly, expressly or by

implication, that they will provide various products and services to their customers, including, but

not limited to, one or more of the following:

> a.      unlimited access to business advisors who will provide individualized
>
> advice;
>
> b.      individualized business plans tailored to the consumer's particular business;

25

or

c.      specialized assistance necessary to develop and obtain business credit.

113.    In truth and in fact, in numerous instances in which the RBC Defendants have made

the representations set forth in Paragraph 112 above, the RBC Defendants did not provide the

products and services they represented they would provide, including but not limited to: (a)

unlimited access to business advisors who will provide individualized advice; (b) individualized

business plans tailored to the consumer's particular business; and (c) specialized assistance

necessary to develop and obtain business credit.

114.    Therefore, the RBC Defendants' representations as set forth in Paragraph 112  of

this Complaint are false and misleading, and constitute a deceptive act or practice in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count Three
### Misrepresentation – Purpose of Request for Financial Information
### (Against the RBC Defendants)

115.    In numerous instances in connection with the telemarketing and sale of their

products and services, the RBC Defendants have represented, directly or indirectly, expressly or by

implication, that they will use consumers' financial information to provide financial advice to

consumers and/or to provide this information to other service providers for the consumers' benefit.

116.    In truth and in fact, in numerous instances in which the RBC Defendants have made

the representations set forth in Paragraph 115 above, the RBC Defendants have not used

consumers' financial information to provide financial advice to consumers and/or to provide this

information to other service providers for the consumers' benefit.  Instead, the RBC Defendants

have asked consumers for their financial information to decide how much to charge consumers for

26

their products and services, and how many products and services to sell them.

117.    Therefore, the RBC Defendants' representations as set forth in Paragraph 115 of this Complaint are false and misleading, and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

118.    Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, which resulted in the adoption of the TSR, 16 C.F.R. Part 310.

119.    The RBC Defendants are "sellers[s]" and "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. §§ 310.2(aa), (cc), and (dd).

120.    LEP, PHD, United Business, OCS, BES, UES, B314, CES, DL, E-commerce Consulting, LLC, Business Development Systems, LLC and Elite Consulting Group, Inc. are "merchant[s]" as defined by the TSR, 16 C.F.R. § 310.2(s).

121.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

122.    The TSR requires telemarketers to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call: (1) the identity of the seller; (2) that the purpose of the call is to sell goods or services; and (3) the nature of the goods and services.  16 C.F.R. §§ 310.4(d)(1), (2), and (3).

123.    Except as expressly permitted by the applicable credit card system, the TSR makes it a deceptive telemarketing act or practice for:

27

    a.     A merchant to present to or deposit into, or cause another to present to or

deposit into, the credit card system for payment, a credit card sales draft generated

by a telemarketing transaction that is not the result of a telemarketing credit card

transaction between the cardholder and the merchant;

    b.     Any person to employ, solicit, or otherwise cause a merchant, or an

employee, representative, or agent of the merchant, to present to or deposit into the

credit card system for payment, a credit card sales draft generated by a

telemarketing transaction that is not the result of a telemarketing credit card

transaction between the cardholder and the merchant; or

    c.     Any person to obtain access to the credit card system through the use of a

business relationship or an affiliation with a merchant, when such access is not

authorized by the merchant agreement or the applicable credit card system.

16 C.F.R. § 310.3(c).

    124.    The TSR prohibits a person from providing substantial assistance or support to any

seller or telemarketer when that person "knows or consciously avoids knowing" that the seller or

telemarketer is engaged in any act or practice that violates Sections 310.3(a), (c), or (d) or Section

310.4 of the TSR.  16 C.F.R. § 310.3(b).

    125.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section

18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or

deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15

U.S.C. § 45(a).

**Count Four**
**Misrepresentation – Performance, Efficacy, Nature, Characteristics**
**(Against the RBC Defendants)**

126.    In numerous instances in connection with the telemarketing offers to sell the RBC

Defendants' products and services, the RBC Defendants, directly or indirectly, expressly or by

implication, have made representations regarding material aspects of the performance, efficacy,

nature, or essential characteristics of their products and services, such as:

> a.    consumers who purchase the RBC Defendants' products and services will
>
> recoup the purchase costs through business earnings;
>
> b.    consumers who purchase the RBC Defendants' products and services will be
>
> able to transfer the purchase costs to their future businesses;
>
> c.    consumers who purchase the RBC Defendants' products and services are
>
> likely to earn substantial income;
>
> d.    the RBC Defendants will provide products and services to their customers
>
> including, but not limited to, one or more of the following:
>
>> (i) unlimited access to business advisors who will provide individualized
>>
>> advice;
>>
>> (ii) individualized business plans tailored to the consumer's particular
>>
>> business; and
>>
>> (iii) specialized assistance necessary to develop and obtain business credit.

127.    In truth and in fact, in numerous instances in which the RBC Defendants have made

the representations set forth in Paragraph 126 above:

> a.    consumers who purchased the RBC Defendants' products and services did

29

not recoup the purchase price through business earnings;

    b.    consumers who purchased the RBC Defendants' products and services were not able to transfer those costs to their future businesses;

    c.    consumers who purchased the RBC Defendants' products and services did not earn substantial income; and

    d.    the RBC Defendants did not provide products and services that they represented they would provide, including but not limited to:

        (i) unlimited access to business advisors who will provide individualized advice;

        (ii) individualized business plans tailored to the consumer's particular business; or

        (iii) specialized assistance necessary to develop and obtain business credit.

128.    Therefore, the RBC Defendants' practices, described in Paragraph 126 above, violate Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

## Count Five
### Failure to Disclose – Identity, Purpose, Nature of Services
### (Against the RBC Defendants)

129.    In numerous instances in connection with the telemarketing and offers to sell the RBC Defendants' products and services, the RBC Defendants, directly or indirectly, have failed to disclose promptly and in a clear and conspicuous manner to the person receiving the call:

    a.    the identity of the seller;

    b.    that the purpose of the call is to sell services; and

    c.    the nature of those services.

130.    The RBC Defendants' acts or practices, as described in Paragraph 129 above, violates Sections 310.4(d)(1), (2) and (3) of the TSR, 16 C.F.R. §§ 310.4(d)(1), (2), and (3).

## Count Six
## Credit Card Laundering
## (Against All Defendants)

131.    In numerous instances and without the express permission of the applicable credit card system, the Defendants have:

a.    Presented to or deposited into, or caused another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant;

b.    Employed, solicited, or otherwise caused a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

c.    Obtained access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

132.    Therefore, Defendants' acts or practices, as described in Paragraph 131 above, violate Section 310.3(c) of the TSR, 16 C.F.R. § 310.3(c).

31

## Count Seven
### Assisting and Facilitating Violations of the TSR
### (Against the Vixous Payments Defendants)

133. The Vixous Payments Defendants provided substantial assistance or support to sellers and telemarketers that the Vixous Payments Defendants knew, or consciously avoided knowing, were engaged in acts or practices that violate Section 310.3(c) of the TSR, as described in Paragraphs 79-104 above.

134. The Vixous Payments Defendants' acts or practices alleged in Paragraph 133 constitute deceptive telemarketing acts or practices in violation of the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

135. Consumers have suffered and will continue to suffer substantial injury as a result of the Defendants' violations of the FTC Act, the Telemarketing Act, and the TSR. In addition, the Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, the Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

136. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and prejudgment interest to prevent and remedy any violation of any provision of law enforced by the FTC.

137. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing

Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from the Defendants' violations of the TSR, including the rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and prejudgment interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(d) of the Telemarketing Act, 15 U.S.C. § 6105(b), and as authorized by the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

B. Enter a permanent injunction to prevent future violations of the FTC Act, the Telemarketing Act, and the TSR by the Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from the Defendants' violations of the FTC Act, the Telemarketing Act, and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and prejudgment interest;

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

33

Respectfully submitted,

JONATHAN E. NUECHTERLEIN
General Counsel

WILLIAM H. EFRON
Director, Northeast Region

Dated: 1/11/2016

Darren H. Lubetzky
Savvas S. Diacosavvas
Karen V. Goff
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2829
Fax: (212) 607-2822
Email: dlubetzky@ftc.gov
Email: sdiacosavvas@ftc.gov
Email: kgoff@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

34